UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

PATRINA FREEMAN,

                                Plaintiff,

                     v.

TOWN OF IRONDEQUOIT, KIMMIE ROMEO,
and JOHN PERTICONE,

                             Defendants.

-------------------------------------------------------------------X

Case No. 22-cv-6136

**COMPLAINT
AND
<u>JURY DEMAND</u>**

Patrina Freeman by her undersigned counsel, as and for her Complaint, alleges as follows:

## <u>INTRODUCTION</u>

1.      This is an action brought by an Black resident of Irondequoit, who is also a member of the Irondequoit Town Council, addressed to actions by officials of the Town of Irondequoit (including members of its Police Department), former Acting Irondequoit Town Supervisor John Perticone, and Irondequoit Town Council Member Kimmie Romeo, to discriminate against Plaintiff because she is Black, and to undercut (on racially discriminatory grounds) a program Plaintiff had commenced under the prior Town Supervisor which would have increased Black home ownership in Irondequoit, and to intimidate Plaintiff by encouraging the presence of armed, White off-duty police officers at meetings conducted by Plaintiff. In numerous other ways Defendants Romeo and Perticone, and other employed by the Town, have harassed, belittled, disrespected, and mistreated Plaintiff, because she is Black and because she was spearheading a program to promote Black homeownership.

## JURISDICTION

2.      This Court's jurisdiction is invoked pursuant to 29 U.S.C. Section 1331, and

42 U.S.C. Sections 1981 and 1983. This Court's pendent jurisdiction is also invoked.

## PARTIES

3.      Plaintiff Patrina Freeman is a resident of the Town of Irondequoit. She is a U.S.

citizen of African American ancestry. At all relevant times she has been a member of the Town

Board, serving as an elected Council Member.

4.      Defendant Town of Irondequoit is a town in Monroe County, New York, United

States. Irondequoit is a suburb of the City of Rochester, lying just north and east of the city

limits. The Town of Irondequoit is a municipal corporations, chartered by the New York State

Legislature pursuant to the Town Law. It is governed by a five member Town Board, one of

whom has the title of Town Supervisor, who serves as the chief administrative official of the

municipal corporation.

5.      Defendant Kimmie Romeo is a member of the Town Board of Irondequoit,

serving as an elected Council Member. She resides at 74 Montaine Park, Rochester, NY 14617.

At all times herein she has acted under color of her authority as a government official, but in

abuse of that authority.

6.      Defendant John Perticone is a member of the Town Board of Irondequoit, serving

as an elected Council Member, and at all relevant times as Acting Town Supervisor. He resides

at 145 Washington Ave., Rochester, NY 14617-2229. At all times herein he has acted under

color of his authority as a government official, but in abuse of that authority.

**RELEVANT FACTS**

7.      Patrina Freeman (the "Plaintiff" or "Ms. Freeman") is a long-time political leader, activist, and church minister—well known in the Rochester aera and in the Town Irondequoit (the "Town").

8.      Plaintiff currently serves as the first Black member, and, in fact, the first non-Caucasian person on the Town Board (also called herein the "Town Council." )

9.      The following is a timeline and summary of relevant incidents of race-based discrimination and harassment Plaintiff has experienced since her election.

10.     In January 2019 former Irondequoit Town Supervisor Dave Seeley first reached out to Plaintiff and asked her to run for Town Board.

11.     As part of her election campaign, and at the behest of Seeley, Ms. Freeman met with Town Councilman and Defendant John Perticone.

12.     Perticone asked numerous personal questions of Plaintiff—unrelated to politics or local civic matters—making her uncomfortable. He repeatedly said, "I have no choice but to run with you," and offered no support.

13.     This started a pattern by Town officials and Town staff of systematic hostility and disregard for Ms. Freeman's involvement in Town government that advanced until she was kept out of Town communications, obstructed from access to Town facilities, and even physically intimidated.

14.     Despite being a first-time candidate and the limited support from the elected officials, the Plaintiff was elected to the Town Council. No person identifying or identified as Asian, African American, or Native American, had ever been elected to this position before.

15.     During the orientation process, just after her election, Ms. Freeman met the head of maintenance, Terry Thomas, who expressed that he held reservations about Ms. Freeman's

3

election because he was a "Trump supporter." He continued, expressing after meeting with her, that nonetheless he would be "OK with it."

16.     Ms. Freeman told Mr. Thomas that it seemed as though he was granting her permission, to which he smiled and made no further comment.

17.     Ms. Freeman, feeling extremely uncomfortable, explained what had occurred to the then Town Supervisor, David Seeley, the Town's Director of Administration, Maria Vecchio, and her fellow Town Councilmembers. In particular, she asked that Mr. Thomas receive training because his comments could create liability for the Town should another person of color encounter him and hear how he felt.

18.     Despite Plaintiff's report, no action was taken to address Mr. Thomas's words.

19.     Approximately one week later, Ms. Freeman noticed a problem with her plaque ordered and installed by Mr. Thomas.

20.      It is the practice of the Town that before a Member of Council takes office, the Town installs a plaque featuring the elected official's name and title. Indeed, each of Ms. Freeman's colleagues had their names and titles on their plaques.

21.     Ms. Freeman's plaque only had her name. It had no mention of her being a Councilwoman. It had no title.

22.     It is the practice of the Town that Town Council members receive badges to identify themselves as elected officials. These badges, however, are rarely worn by Town officials.

23.     Ms. Freeman, however, had to wear her badge constantly. Without it, she was denied access to certain Town facilities, even though her picture was hanging in the Town Hall. No other Councilmember was required to wear their badge in order to have access.

24.     Even the badge has not prevented discriminatory harassment. As recently as November 15, 2021, when Plaintiff entered City Hall after 5pm, she was challenged and

4

followed by a Town of Irondequoit employee who followed her, demanded an explanation for her presence, and told her that the building was closed.

25.     From early on in her term, Ms. Freeman did not receive full packets of materials for her meetings, nor did she receive her packets in a timely manner. Further, during meetings her colleagues repeatedly shouted at and talked over Ms. Freeman.

26.     Ms. Freeman tried on several occasions to address these concerns. Unable to find any resolution, in March 2020, Ms. Freeman requested a formal meeting with her Town Board colleagues. Their response was to tell her to "get over it" and that "It happens to everyone."

27.     On May 25, 2020, a Black Minneapolis resident named George Floyd was murdered in Minnesota by police officers—an event that caused protests across the United States (including in Irondequoit and Rochester) regarding policing, race discrimination, and race inequality.

28.     On May 30, 2020, Ms. Freeman traveled to East Ridge Road in Irondequoit to survey damage done after a night of intense local protests. At the site she saw two police cars. Plaintiff approached one of the police cars, identified herself as a Town Councilwoman, and asked them for information about the damage.

29.     The response of the officers was to ignore Plaintiff's requests for information.

30.     Plaintiff then asked both officers for their names. The officer on the driver's side answered, "Brandon. Why? You want to put it on Facebook?"

31.     Shocked, Ms. Freeman went to another police car where she recognized the officer inside, Johnathan Lawton. Lawton was an officer that she had worked with for years on different initiatives. Officer Lawton shouted from his car to the other police vehicle asking the officer who refused to identify himself to state his name. Officer Lawton also identified Ms. Freeman as a Council Member.

32.     The police officer who refused to identify himself said nothing, continuing to refuse to fully identify himself to Plaintiff.

33.     Plaintiff followed up by calling Town Supervisor Seeley and the Chief of Police, Alan Laird, informing them of her confrontation with the officer that refused to identify himself.

34.     Laird and Seeley informed Ms. Freeman that they would discipline the officer.

35.     Later, after Ms. Freeman followed up; though Laird and Seeley told Plaintiff that they had disciplined the officer, they refused to tell her what specific actions that they had taken, and no apology was given by the officer to Plaintiff.

36.     Plaintiff explained that she had a right to know, as the officers answer to the Chief of Police and the Chief of Police answers to the Town Council. Seeley and Laird, however, were unpersuaded by this, and to this day Ms. Freeman has no idea what, if any, disciplinary action occurred.

37.     In June 2020, Ms. Freeman was named Co-Chair of the Monroe County Alliance for the Transformation of Community Policing. She started to schedule meetings at the Irondequoit Public Library.

38.     Terry Thomas, head of maintenance, repeatedly refused to set up tables or prepare space for their meetings. Ms. Freeman explained her concerns directly to Mr. Thomas and to the Town Council and was told again, "That's just Terry." Plaintiff explained that Thomas's behavior, even if considered unintentional, was objectively discriminatory. Still, the Town Council took no action.

39.     In early August 2020, concerned by local protests and in response to the growing Black Lives Matter movement, Town Supervisor Seeley contacted Ms. Freeman and told her that he wanted to work on anti-racism measures, including forming a commission called I-CARE (Irondequoit Commission Advancing Racial Equity). I-CARE's stated mission is to examine

Town policies, procedures, and practices to ensure that everyone in the Town is represented by the local government, regardless of race, religion, or cultural identity.

40.     Subsequently, the then Town Supervisor Seeley asked Ms. Freeman to be the Chair of I-CARE and spearhead its initiatives, and she agreed.

41.     Ms. Freeman dedicated her efforts to develop and build I-CARE by recommending members to serve as Vice-Chairs and Community Shareholders and preparing a budget, goals, and I-CARE policies and procedures.

42.     Once the Town Council appointed I-CARE'S leadership, Ms. Freeman developed an Orientation Manual and conducted a two-day training for members of the commission.

43.     Plaintiff spoke to the Town's Director of Administration, Maria Vecchio, requesting duplication of the binders full of orientation materials. Ms. Vecchio denied her request and was told that there was no money available. Plaintiff reproduced the binders at her own expense.

44.     Later, in February 2021, Ms. Freeman told Town Supervisor Seeley that her request for binders had been denied. Seeley expressed shock and dismay and immediately refunded Ms. Freeman the cost of the binders from the Supervisor's budget.

45.     Seeley then restated to Ms. Freeman his commitment to I-CARE, explaining to Ms. Freeman that he would provide her with an Administrative Assistant.

46.     Further, Seeley approved of Freeman's initiative, through I-CARE, to create a first-time buyers program targeting minorities and underprivileged members of the Town. The planned program was to be funded with resources from the American Rescue Act.

47.     Despite Seeley's support, in March 2021 Freeman tried to buy lunch for an I-CARE Orientation, but the Director of Administration told her that no money was available.

48.      When the Irondequoit Rotary Club reached out to I-CARE about funding a project, Seeley suggested that Vecchio provide Freeman with a list of approved website contractors. However, when Freeman met with Vecchio about the website, Vecchio denied her request stating that I-CARE "did not need a website," and that she did not support the I-CARE Program.

49.      Ms. Freeman has been advised that I-CARE cannot use rooms to conduct business without paying a fee.

50.      With Seeley's backing and full Town Council approval, the Town prepared and approved a request for proposal for agencies interested in administering a new first-time home buyers' program and the hiring of a part-time Administrative Assistant.

51.      Two organizations responded: The Urban League and The Housing Council at PathStone. The Town Council unanimously selected the Urban League.

52.       In June 2021, Defendant Councilwoman Kimmie Romeo and Defendant Councilman John Perticone suddenly changed course, opposing the selection of the Urban League because they said the program was "solely targeting Black people."

53.      Further, Romeo and Perticone were suddenly opposed to the hiring of a part-time Administrative Assistant for I-CARE, and actively worked to prevent the creation of such a position.

54.      Plaintiff explained to Defendants Romeo and Perticone that the Town Council had already approved the request for proposal and the selection of the Urban League as well as the Administrative Assistant position.

55.      In response, Defendant Romeo demanded an immediate accounting of all I-CARE activities and a comprehensive budget.

56.      Plaintiff responded that the budget was approved by the Supervisor Seeley and contained within the budget of the Supervisor's office.

57.     On August 1, 2021, Defendant John Perticone replaced Town Supervisor Seeley as Acting Supervisor, following Town Supervisor Seeley's sudden decision to step down.

58.     Besides Ms. Freeman, Town Supervisor Seeley had been I-CARE's biggest supporter. Without the Supervisor's support, the attacks on I-CARE and Ms. Freeman herself intensified.

59.     At a public meeting on August 10, 2021, Defendant Kimmie Romeo asked to read something into the record. In Romeo's statement she declared that she wanted the Town Clerk to document that she met with residents that wanted information regarding I-CARE's activities. She stated that residents were unhappy that they could not publicly access information on I-CARE's budget and activities, and that residents had made legal requests for information that were denied. Ms. Freeman asked the Town Clerk if such requests were made, and no such records of requests could be found.

60.     Plaintiff subsequently approached Defendant Romeo in private to see if she could resolve the matter. She expressed to Ms. Romeo that there was no need to imply secrecy or wrongdoing because Ms. Freeman had submitted the budget to the Supervisor's office and Ms. Romeo was fully aware and previously supported I-CARE.

61.     The conversation became mutually argumentative. Defendant Romeo seized upon this opportunity to falsely accuse Ms. Freeman—a longtime minister and peace advocate—of threatening her life. Defendant followed up by calling the police and filing a false complaint six days later.

62.     Feeling exhausted and confused, Ms. Freeman went to the Defendant Acting Supervisor, Perticone, to express her dismay, especially given the Town Council's previous support.

63.     Defendant Perticone blamed Ms. Freeman for her predicament and accused her of having an agenda which was not in the interests of the Town.

9

64. Perticone stated that he was going to assert control over I-CARE, to which Ms. Freeman explained that a commission—once formed and charged with its authority—cannot be dominated by anyone other than the commission members, otherwise the reports and work of the commission might be considered tainted or biased.

65. Exhausted, but undaunted, Ms. Freeman prepared a preliminary I-CARE budget for 2022 and submitted it to the Town Board.

66. Subsequent budget meetings became hostile, however, with I-CARE becoming a subject of a heated debate.

67. On several occasions between October and November 2021, off-duty armed members of the Irondequoit Police Department came unannounced to public meetings on the I-CARE budget, sitting in the front row, firearms openly visible, glaring at Plaintiff.

68. Ms. Freeman expressed to her fellow Councilmembers and Police Chief Alan Liard that these actions were intimidating.

69. Freeman was told by Defendant Romeo (the liaison to the police) that it was a "free country" and that they had just as much of a right to be there as anyone.

70. On October 27, 2021, Acting Supervisor Perticone was recorded chasing, screaming, blocking the way of, and harassing Ms. Freeman for recording the presence of police officers at a budget meeting concerning, in part, the I-CARE budget. This incident was highlighted by local media.

71. Despite the presence of those officers, and Chief of Police Alan Laird, no one stepped in to aid or assist Ms. Freeman

72. Rory Fitzpatrick was elected Town Supervisor Irondequoit in November 2021.

73. At the present time, the status of I-CARE is in doubt, with the newly elected Supervisor, Rory Fitzpatrick, attempting to unilaterally assert control over the commission by

sending communications to I-CARE members without consultation with the Chair or Vice-Chairs, and denying Ms. Freeman access to relevant information and undermining her role as Chair.

74.     At present, Ms. Freeman herself feels unwelcomed in the Town Hall, she continues to be scolded and screamed at in Council meetings by her colleagues and by Town employees. She is often not included in official communications and is prevented from participating in official business.

75.     Ms. Freeman has complained on several occasions to the Human Resources Department of the Town of Irondequoit about the race-based discrimination that she has experienced, but no change has occurred. Instead, the HR personal described what was occurring as a "personal dispute," and suggested a conflict resolution process.

76.     The treatment of Plaintiff Freeman has occurred because of her race, and because her work involves associating with and giving aid to people who are non-white.

77.     As a result of the foregoing, Ms. Freeman is experiencing both physical and emotional distress, which has caused her to seek and receive medical treatment.

78.     The facts set forth above are incorporated by reference into the causes of action stated below.

### AS AND FOR A FIRST CAUSEOF ACTION

79.     Defendants Perticone and Romeo, by acting as aforedescribed, have sought to deny Plaintiff, and those whose interests she is promoting—Black potential homeowners—of equal protection of the law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

80.     The actions of Defendants Perticone and Romeo were done under color of their authority as government officials, making them liable under 42 U.S.C. Section 1983.

## AS AND FOR A SECOND CAUSEOF ACTION

81.     Because Defendant Perticone took his actions as Town Supervisor, and because his actions and those of Defendant Romeo and the police officers seeking to intimidate Plaintiff were not addressed by the Town of Irondequoit, and were, in fact, condoned by the Town of Irondequoit, the Town of Irondequoit is liable to Plaintiff for the injury cause for violation of her rights to equal protection under the Fourteenth Amendment.

## AS AND FOR A THIRD CAUSEOF ACTION

82.     Defendants Perticone and Romeo's actions described above were taken because Plaintiff is Black, and because her program with I-CARE was seen as increasing the Black population in Irondequoit, therefore violating her rights under 42 U.S.C. Section 1981.

## AS AND FOR A FOURTH CAUSEOF ACTION

83.     Defendant Romeo, by making a false report to the police alleging an assault and/or "threat" by Plaintiff, defamed Plaintiff. The report was false, Romeo knew it was false when it was made, and it injured Plaintiff's reputation.

## DAMAGES

84.     As a proximate result, Plaintiff has suffered severe emotional distress, to her injury in the sum of $1 million.

85.     Defendant Perticone's and Romeo's  actions were wanton, willful, and or reckless, entitling Plaintiff to an award of punitive damages.

## JURY DEMAND

86.     Plaintiff demands that this case be tried by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Petitioner prays that this Court:

a.        Enter a Preliminary and Permanent Injunction:

      1.        Enjoining and restraining, pending trial, the operation of I-CARE; and

      2.        Enjoining the Town of Irondequoit police Department from allowing its officers to attend I-CARE meetings while armed, and with making their presence known at the meetings in a manner which is designed to intimidate Plaintiff and other attendees;

b.        Enter judgment against Defendants, jointly and severally, ordering payment of compensatory damages in the sum of $1 million;

c.        Enter judgment against Defendants Romeo and Perticone, jointly and severally ordering payment of punitive damages of $1 million;

d.        Award attorneys' fees and costs; and

e.        Grant such other and further relief as is just and equitable.

Dated: New York, New York
       March 23, 2022

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
*Attorneys for Plaintiff*

By:_____/s/ *Nathan McMurray*_____
      Nathan McMurray
505 Ellicott Street
Buffalo, New York 14203
(716) 517-5506
nmcmurray@advocatesny.com

By:_____/s/ *Arthur Z. Schwartz*_____
      Arthur Z. Schwartz
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400/917-923-8136
aschwartz@afjlaw.com
