UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

PATRINA FREEMAN,

                          Plaintiff,

        v.

TOWN OF IRONDEQUOIT, KIMMY ROMEO,
and JOHN PERTICONE,

Case No. 22-cv-6136

**FIRST AMENDED
COMPLAINT
AND
<u>JURY DEMAND</u>**

                          Defendants.

-----------------------------------------------------------------X

     Plaintiff amends the caption to read:

-----------------------------------------------------------------X

PATRINA FREEMAN, Individually and as Chair of
the Irondequoit Commission Advancing Racial
Equality,

                          Plaintiff,

        v.

TOWN OF IRONDEQUOIT; KIMMIE ROMEO,
Individually; and JOHN PERTICONE, Individually,

                          Defendants.

-----------------------------------------------------------------X

     Patrina Freeman by her undersigned counsel, as and for her First Amended Complaint, alleges as follows:

## INTRODUCTION

1. This is an action brought by an Black resident of Irondequoit, who is also a member of the Irondequoit Town Council and Chair of the Irondequoit Commission Advancing Racial Equality ("I-CARE"), addressed to actions by officials of the Town of Irondequoit (former Acting Irondequoit Town Supervisor John Perticone, and Irondequoit Town Council Member Kimmie Romeo,and other employees of the Town, discriminating against Plaintiff because she is Black, and to undercut, on racially discriminatory grounds, the program developed by I-CARE designed to increase Black home ownership in Irondequoit. In numerous other ways Defendants Romeo and Perticone, and other employed by the Town, have harassed, belittled, disrespected, and mistreated Plaintiff, because she is Black, and because she was spearheading a program to promote Black homeownership.

## JURISDICTION

2. This Court's jurisdiction is invoked pursuant to 29 U.S.C. Section 1331, and 42 U.S.C. Sections 1981 and 1983. This Court's pendent jurisdiction is also invoked.

## PARTIES

3. Plaintiff Patrina Freeman is a resident of the Town of Irondequoit. She is a U.S. citizen of African American ancestry. At all relevant times she has been a member of the Town Board, serving as an elected Council Member. In that capacity, the Town of Irondequoit is her employer. She is also Chair of I-CARE, which began as a Town Commission and continues to function as an unincorporated association; Plaintiff brings this proceeding both as an individual and as Chair of I-CARE.

4. Defendant Town of Irondequoit is a town in Monroe County, New York, United States. Irondequoit is a suburb of the City of Rochester, lying just north and east of the city limits. The Town of Irondequoit is a municipal corporations, chartered by the New York State

Legislature pursuant to the Town Law. It is governed by a five member Town Board, one of whom has the title of Town Supervisor, who serves as the chief administrative official of the municipal corporation.

5. Defendant Kimmie Romeo is a member of the Town Board of Irondequoit, serving as an elected Council Member. She resides at 74 Montaine Park, Rochester, NY 14617. At all times herein, except at the time she is alleged to have defamed Plaintiff, she has acted under color of her authority as a government official, except when she was making defamatory accusations against Plaintiff, but in abuse of that authority.

6. Defendant John Perticone is a member of the Town Board of Irondequoit, serving as an elected Council Member, and at relevant times as Acting Town Supervisor. He resides at 145 Washington Ave., Rochester, NY 14617-2229. At all times herein he has acted under color of his authority as a government official, but in abuse of that authority.

## RELEVANT FACTS

7. Patrina Freeman (the "Plaintiff" or "Ms. Freeman") is a long-time political leader, activist, and church minister—well known in the Rochester area and in the Town Irondequoit (the "Town").

8. Plaintiff currently serves and at all relevant times served as the first and only Black member, and, in fact, the first non-Caucasian person on the Town Board (also called herein the "Town Council.")

9. In January 2019 former Irondequoit Town Supervisor Dave Seeley first reached out to Plaintiff and asked her to run for Town Board.

10. As part of her election campaign, and at the behest of Seeley, Ms. Freeman met with Town Councilman and Defendant John Perticone.

11. Perticone asked numerous personal questions of Plaintiff—unrelated to politics or local civic matters—making her uncomfortable. He repeatedly said, "I have no choice but to run with you," indicating, she believed, that he had an aversion to running on a ticket with a Black woman.

12. This started a pattern by Town officials, and Town staff, of systematic hostility and disregard for Ms. Freeman's involvement in Town government that advanced until she was kept out of Town communications, obstructed from access to Town facilities, and even physically intimidated, all done in a manner not directed to white members of the Town Council.

13. Despite being a first-time candidate and the limited support from other elected officials, the Plaintiff was elected to the Town Council. No person identifying or identified as Asian, African American, or Native American, had ever been elected to this position before.

14. During the orientation process, just after her election, Ms. Freeman met the head of maintenance, Terry Thomas, who expressed that he held reservations about Ms. Freeman's election because he was a "Trump supporter." She understood this to mean that he had trouble working with a Black woman. He continued, expressing after meeting with her, that nonetheless he would be "OK with it."

15. Ms. Freeman, feeling extremely uncomfortable, explained what had occurred with Mr. Thomas to the then Town Supervisor, David Seeley, the Town's Director of Administration, Maria Vecchio, and to other Town Councilmembers. In particular, she asked that Mr. Thomas receive training because his comments could create liability for the Town should another person of color encounter him and hear how he felt.

16. Despite Plaintiff's report, upon information and belief, no action was taken to address Mr. Thomas's actions.

17. Approximately one week later, Ms. Freeman noticed a problem with her plaque ordered and installed by Mr. Thomas.

18. It is the practice of the Town that before a Member of Council takes office, the Town installs a plaque in the Town Hall featuring the elected official's name and title. Indeed, each of Ms. Freeman's colleagues, all of whom were white, had their names and titles on their plaques. But Ms. Freeman's plaque only had her name. It had no mention of her being a Councilwoman. It had no title.

19. In addition, Town Council members receive badges to identify themselves as elected officials. These badges, however, are rarely worn by Town officials. Ms. Freeman, the only Black Town Councilmember, was required, however, to wear her badge constantly. Without it, she was denied access to certain Town facilities, even though her picture was hanging in the Town Hall and even though she identified herself as a Councilmember. No other Councilmember (all of whom were white) was required to wear their badge in order to have access.

20. Even wearing the badge has not prevented discriminatory harassment. As recently as November 15, 2021, when Plaintiff entered City Hall after 5pm, she was challenged and followed by a white Town employee who followed her, demanded an explanation for her presence, and told her that the building was closed. Upon information and belief, he was motivated by the fact that she was Black and walking around a building which hosted few Black people.

21. From early on in her term, Ms. Freeman did not receive full packets of materials for her meetings, unlike white Councilmembers, nor did she receive her packets in a timely manner, unlike white Councilmembers. Further, during meetings her colleagues (all of whom are white) repeatedly shouted at and talked over Ms. Freeman and treated her less respectfully than they did other, white Councilmembers.

22.     Ms. Freeman tried on several occasions to address these concerns. Unable to find any resolution, in March 2020, Ms. Freeman requested a formal meeting with her Town Board colleagues. Their response was to tell her to "get over it" and that "It happens to everyone."

23.     On May 25, 2020, a Black Minneapolis, Minnesota resident named George Floyd was murdered in Minnesota by police officers—an event that caused protests across the United States (including in Irondequoit and Rochester) regarding policing, race discrimination, and race inequality.

24.     On May 30, 2020, Ms. Freeman traveled to East Ridge Road in Irondequoit to survey damage done after a night of intense local protests. At the site she saw two police cars. Plaintiff approached one of the police cars, identified herself as a Town Councilwoman, and asked the two white officers inside for information about the damage.

25.     The response of the officers was to ignore Plaintiff's requests for information.

26.     Plaintiff then asked both officers for their names. The officer on the driver's side answered, "Brandon. Why? You want to put it on Facebook?"

27.     Shocked, Ms. Freeman went to another police car where she recognized the officer inside, Johnathan Lawton. Lawton was an officer that she had worked with for years on different initiatives. Officer Lawton shouted from his car to the other police vehicle asking the officer who refused to identify himself to state his name. Officer Lawton also identified Ms. Freeman as a Council Member. The police officer who refused to identify himself said nothing, continuing to refuse to fully identify himself to Plaintiff.

28.     Plaintiff followed up by calling Town Supervisor Seeley and the Chief of Police, Alan Laird, informing them of her confrontation with the officer that refused to identify himself. Laird and Seeley informed Ms. Freeman that they would discipline the officer.

29. Later, after Ms. Freeman followed up; though Laird and Seeley told Plaintiff that they had disciplined the officer, they refused to tell her what specific actions that they had taken, and no apology was given by the officer to Plaintiff. Plaintiff asserted that she had a right to know, as the officers answer to the Chief of Police and the Chief of Police answers to the Town Council. Seeley and Laird, however, were unpersuaded by this, and to this day Ms. Freeman has no idea what, if any, disciplinary action occurred.

30. In June 2020, Ms. Freeman was named Co-Chair of the Monroe County Alliance for the Transformation of Community Policing. She started to schedule meetings at the Irondequoit Public Library, a Town-owned facility.

31. Terry Thomas, head of maintenance, repeatedly refused to set up tables or prepare space for the Alliance meetings, which, upon information and belief was not the practice with other organizations using the library. . Ms. Freeman explained her concerns directly to Mr. Thomas and to the Town Council and was told again, "That's just Terry." Plaintiff explained that Thomas's behavior, even if considered unintentional, was objectively discriminatory. Still, the Town Council took no action.

32. In early August 2020, concerned by local protests and in response to the growing Black Lives Matter movement, Town Supervisor Seeley contacted Ms. Freeman and told her that he wanted to work on anti-racism measures, including forming a commission called I-CARE (Irondequoit Commission Advancing Racial Equity). I-CARE's stated mission is to examine Town policies, procedures, and practices to ensure that everyone in the Town is represented by the local government, regardless of race, religion, or cultural identity.

33. Subsequently, the then Town Supervisor Seeley asked Ms. Freeman to be the Chair of I-CARE and spearhead its initiatives.

34. Ms. Freeman accepted and dedicated her efforts to develop and build I-CARE by recommending members to serve as Vice-Chairs and Community Shareholders and preparing a budget, goals, and I-CARE policies and procedures.

35. Once the Town Council appointed I-CARE'S leadership, Ms. Freeman developed an Orientation Manual and conducted a two-day training for members of the commission. Plaintiff spoke to the Town's Director of Administration, Maria Vecchio, requesting duplication of the binders full of orientation materials. Ms. Vecchio denied her request and was told that there was no money available. Plaintiff reproduced the binders at her own expense.

36. Later, in February 2021, Ms. Freeman told Town Supervisor Seeley that her request for binders had been denied. Seeley expressed shock and dismay and immediately refunded Ms. Freeman the cost of the binders from the Supervisor's budget. Seeley then restated to Ms. Freeman his commitment to I-CARE, explaining to Ms. Freeman that he would provide her with an Administrative Assistant.

37. Further, Seeley approved of Freeman's initiative, through I-CARE, to create a first-time buyers program targeting minorities and underprivileged members of the Town. The planned buyers program was to be funded with resources recovered by the Town from the American Rescue Act, which amounted to millions of dollars.

38. Despite Seeley's support, in March 2021 Freeman tried to arrange for the town to pay for lunch for an I-CARE Orientation to the Town, but the Director of Administration told her that no money was available, which, upon information and belief, was untrue.

39. When the Irondequoit Rotary Club reached out to I-CARE about funding a project, Seeley suggested that Vecchio provide Freeman with a list of approved website contractors. However, when Freeman met with Vecchio about the website, Vecchio denied her request stating

that I-CARE "did not need a website," and made it clear that she did not support the I-CARE Program.

40. During Spring 2021, with Seeley's backing, the Plaintiff prepared and the Town Council approved a Request for Proposal, seeking agencies interested in administering a new first-time home buyers' program, and the hiring of a part-time Administrative Assistant for I-CARE.

41. Two organizations responded: The Urban League and The Housing Council at PathStone. The Town Council unanimously selected the Urban League.

42. In June 2021, Defendant Councilwoman Kimmie Romeo and Defendant Councilman John Perticone suddenly changed their position, announcing opposition to the selection of the Urban League because they said that if the Urban League administered the program, it would "solely be targeting Black people."

43. Further, Romeo and Perticone announced that they now opposed to the hiring of a part- time Administrative Assistant for I-CARE, and actively worked to prevent the filling of such a position.

44. Plaintiff met with Defendants Romeo and Perticone and explained that the Town Council had already approved the request for proposal and the selection of the Urban League as well as the Administrative Assistant position. In response, Defendant Romeo demanded an immediate accounting of all I-CARE activities and a comprehensive budget. Plaintiff responded that the budget had been approved by the Supervisor Seeley and contained within the budget of the Supervisor's office.

45. On August 1, 2021, Defendant John Perticone replaced Town Supervisor Seeley as Acting Supervisor, following Town Supervisor Seeley's sudden decision to step down.

46. Besides Ms. Freeman, Town Supervisor Seeley had been I-CARE's biggest supporter. Without the Supervisor's support, the racially motivated attacks on I-CARE and Ms. Freeman herself intensified.

47. At a public meeting on August 10, 2021, Defendant Kimmie Romeo asked to read something into the record. In Romeo's statement she declared that she wanted the Town Clerk to document that she met with residents who wanted information regarding I-CARE's activities. She stated that residents were unhappy that they could not publicly access information on I-CARE's budget and activities, and that residents had made legal requests for information that were denied. Ms. Freeman asked the Town Clerk if such requests were made, and no records of such requests could be found.

48. Plaintiff subsequently approached Defendant Romeo in private to see if she could resolve the matter. She expressed to Ms. Romeo that there was no need to imply secrecy or wrongdoing because Ms. Freeman had submitted the budget to the Supervisor's office, and that no request for information had been ignored.

49. The conversation became mutually argumentative. Subsequently, Defendant Romeo falsely accused Ms. Freeman—a longtime minister and peace advocate—stating that Plaintiff has "Threatened her life." Defendant Romeo followed up by calling the police and filing a false complaint, making the same false allegation six days later.

50. Feeling exhausted and confused, Ms. Freeman went to the Defendant Acting Supervisor, Perticone, to express her dismay, especially given the Town Council's previous support. Defendant Perticone blamed Ms. Freeman for her predicament and accused her of having an "agenda" which was not in the interests of the Town. She understood this to mean that having more Black homeowners in the Town was "not in the interests of the Town."

51. Perticone stated that he was going to assert control over I-CARE, to which Ms. Freeman explained that a Town Commission—once formed and given authority to proceed—cannot be run by anyone other than the Commission members.

52. Following her meeting with Perticone, Ms. Freeman prepared a preliminary I-CARE budget for 2022 and submitted it to the Town Board. Subsequent budget meetings became hostile, however, with I-CARE becoming a subject of a heated debate. A budget was never approved.

53. On several occasions between October and November 2021, off-duty armed members of the Irondequoit Police Department came unannounced to public meetings on the I-CARE budget. They sat in the front row, firearms openly visible, glaring at Plaintiff throughout the meeting. Ms. Freeman expressed to her fellow Councilmembers and Police Chief Alan Liard that these actions were intimidating.

54. Freeman was told by Defendant Romeo (who was the Town Council liaison to the police) that it was a "free country" and that the police had just as much of a right to be there as anyone.

55. On October 27, 2021, Acting Supervisor Perticone was recorded chasing, screaming, blocking the way of, and harassing Ms. Freeman because she was recording the presence of police officers at a budget meeting concerning, in part, the proposed I-CARE budget. This incident was highlighted by local media.

56. In November 2021, Rory Fitzpatrick was elected Town Supervisor of Irondequoit.

57. In late 2021 the status of I-CARE was in doubt, with the newly elected Supervisor, Rory Fitzpatrick, attempting to unilaterally assert control over the Commission by sending communications to I-CARE members without consultation with the Chair or Vice-Chairs, denying Ms. Freeman access to relevant information and undermining her role as Chair, labeling

I-CARE as a private organization, barring I-CARE from Town facilities, and refusing to honor I-CARE's contract with the Urban League.

58. At present, Ms. Freeman herself continued to feel unwelcomed in the Town Hall because she is Black. She continues to be scolded and screamed at in Council meetings by her colleagues and by Town employees. She is often not included in official communications, unlike the Council's white members, and is prevented from participating in official business.

59. Ms. Freeman has complained on several occasions to the Human Resources Department of the Town of Irondequoit about the race-based discrimination that she has experienced, but no change has occurred. Instead, the HR personal described what was occurring as a "personal dispute."

60. The treatment of Plaintiff Freeman has occurred because of her race, and because her work involves associating with and giving aid to people who are non-white.

61. As a result of the foregoing, Ms. Freeman is experiencing both physical and emotional distress, which has caused her to seek and receive medical treatment, and avoid Town Council activities.

62. The facts set forth above are incorporated by reference into the causes of action stated below.

## AS AND FOR A FIRST CAUSEOF ACTION

63. Defendants Perticone and Romeo, by acting as aforedescribed, have sought to deny Plaintiff, and those whose interests she is responsible for advancing—Black potential homeowners—of equal protection of the law, as guaranteed by the Fourteenth Amendment to the United States Constitution.

64. The actions of Defendants Perticone and Romeo were done under color of their authority as government officials, making them liable under 42 U.S.C. Section 1983.

**AS AND FOR A SECOND CAUSE OF ACTION**

65. Because Defendant Perticone took his actions as Town Supervisor, and because his actions and those of Defendant Romeo and the police officers seeking to intimidate Plaintiff were not addressed by the Town of Irondequoit, and were, in fact, condoned by the Town of Irondequoit, the Town of Irondequoit is liable to Plaintiff for the injury cause for violation of her rights to equal protection under the Fourteenth Amendment.

66. Because it condoned Perticone and Romeo's actions, and the actions of the other Town employees who discriminated against Plaintiff, and her efforts to develop the work of I-Care, it is liable under 42 U.S.C. Section 1983.

**AS AND FOR A THIRD CAUSE OF ACTION**

67. Defendants Perticone, Romeo, and the Town's actions interfering with I-CARE's ability to contract and Plaintiff's ability to function as its Chair were taken because Plaintiff is Black, and because her program with I-CARE was seen as increasing the Black population in Irondequoit, therefore violating her rights under 42 U.S.C. Section 1981.

**AS AND FOR A FOURTH CAUSE OF ACTION**

68. Defendant Romeo, acting individually, by making a false report to the police alleging an assault and/or "threat" by Plaintiff, defamed Plaintiff. The report was false, Romeo knew it was false when it was made, and it injured Plaintiff's reputation.

**DAMAGES**

69. As a proximate result, Plaintiff has suffered severe emotional distress, to her injury in the sum of $1 million.

70. Defendant Perticone's and Romeo's actions were wanton, willful, and or reckless, entitling Plaintiff to an award of punitive damages.

## **JURY DEMAND**

71.     Plaintiff demands that this case be tried by jury.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Petitioner prays that this Court:

a.      Enter a Preliminary and Permanent Injunction enjoining and restraining interference with the operation of I-CARE; and

b.      Enter judgment against Defendants, jointly and severally, ordering payment of compensatory damages in the sum of $1 million;

c.      Enter judgment against Defendants Romeo and Perticone, jointly and severally ordering payment of punitive damages of $1 million;

d.      Award attorneys' fees and costs; and

e.      Grant such other and further relief as is just and equitable.

Dated:  New York, New York
        July 22, 2022

>                               ADVOCATES FOR JUSTICE,
>                               CHARTERED ATTORNEYS
>                               *Attorneys for Plaintiff*
>
>                               By:      /s/ *Nathan McMurray*
>                                        Nathan McMurray
>                               505 Ellicott Street
>                               Buffalo, New York 14203
>                               (716) 517-5506
>                               nmcmurray@advocatesny.com
>
>                               By:      /s/ *Arthur Z. Schwartz*
>                                        Arthur Z. Schwartz
>                               225 Broadway, Suite 1902
>                               New York, New York 10007
>                               (212) 285-1400/917-923-8136
>                               aschwartz@afjlaw.com