UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
 ----------------------------------------------------------------X

PATRINA FREEMAN,

                                                                    Case No. 22-cv-6136

                                    Plaintiff,

            v.

TOWN OF IRONDEQUOIT, KIMMIE ROMEO,
and JOHN PERTICONE,

                                    Defendants.


 ----------------------------------------------------------------X

### PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE
### TO DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

        Defendants seek to dismiss Plaintiff's Complaint largely on the grounds that she has (a) not properly served process, (b) failed to properly plead an equal protection claim under 42 USC Sec. 1983, (c) failed to plead a Section 1981 claim because she did not sufficiently identify what actions she were discriminatory based on race, (d) failed to sufficiently plead municipal liability for her Federal claims, and (e) failed to serve a proper notice of claim on the defamation cause of action (brought against Defendant Romeo personally. The individual defendants also argue that their actions are shielded by legislative and qualified immunity.

        The Motion to Dismiss was addressed to the Complaint as initially filed. Although we believe that that Complaint was sufficient, we have moved for leave to file an amended complaint which addresses most of the deficiencies pointed to by defendants.

        As will be explained below, the First Amended Complaint sufficiently pleads facts to hold the individual defendants and the municipal defendant liable for violation of Plaintiff's

Constitutional and other rights under Sections 1983 and 1981. Further none of the actions complained of were carried out as part of legislative decision-making, nor are they otherwise protected by qualified immunity because of the individual defendants' rather open and explicit expression of racial animus that undergirded their actions.

## STATEMENT OF FACTS

This statement of facts is largely adopted from the Proposed First Amended Complaint.[1]

Plaintiff Patrina Freeman is a resident of the Town of Irondequoit. She is a U.S. citizen of African American ancestry. At all relevant times she has been a member of the Town Board, serving as an elected Council Member. In that capacity, the Town of Irondequoit is her employer. She is also Chair of I-CARE, which began as a Town Commission and continues to function as an unincorporated association; Plaintiff brings this proceeding both as an individual and as Chair of I-CARE.

Defendant Town of Irondequoit is a town in Monroe County, New York, United States. Irondequoit is a suburb of the City of Rochester, lying just north and east of the city limits. The Town of Irondequoit is a municipal corporations, chartered by the New York State Legislature pursuant to the Town Law. It is governed by a five member Town Board, one of whom has the title of Town Supervisor, who serves as the chief administrative official of the municipal corporation.

Defendant Kimmie Romeo is a member of the Town Board of Irondequoit, serving as an elected Council Member. She resides at 74 Montaine Park, Rochester, NY 14617. At all times herein, except at the time she is alleged to have defamed Plaintiff, she has acted under color of

---

[1] Plaintiff has filed, simultaneously with this brief, a Motion for Leave to File a First Amended Complaint. The facts are drawn from that document.

her authority as a government official, except when she was making defamatory accusations against Plaintiff, but in abuse of that authority.

Defendant John Perticone is a member of the Town Board of Irondequoit, serving as an elected Council Member, and at  relevant times as Acting Town Supervisor. He resides at 145 Washington Ave., Rochester, NY 14617-2229. At all times herein he has acted under color of his authority as a government official, but in abuse of that authority.

Patrina Freeman (the "Plaintiff" or "Ms. Freeman") is a long-time political leader, activist, and church minister—well known in the Rochester area and in the Town Irondequoit (the "Town").

Plaintiff currently serves and at all relevant times served as the first and only Black member, and, in fact, the first non-Caucasian person on the Town Board (also called herein the "Town Council." )

In January 2019 former Irondequoit Town Supervisor Dave Seeley first reached out to Plaintiff and asked her to run for Town Board.

As part of her election campaign, and at the behest of Seeley, Ms. Freeman met with Town Councilman and Defendant John Perticone.

Perticone asked numerous personal questions of Plaintiff—unrelated to politics or local civic matters—making her uncomfortable. He repeatedly said, "I have no choice but to run with you," indicating, she believed, that he had an aversion to running on a ticket with a Black woman.

This started a pattern by Town officials, and Town staff, of systematic hostility and disregard for Ms. Freeman's involvement in Town government that advanced until she was kept out of Town communications, obstructed from access to Town facilities, and even

physically intimidated, all done in a manner not directed to white members of the Town Council.

Despite being a first-time candidate and the limited support from other elected officials, the Plaintiff was elected to the Town Council. No person identifying or identified as Asian, African American, or Native American, had ever been elected to this position before.

During the orientation process, just after her election, Ms. Freeman met the head of maintenance, Terry Thomas, who expressed that he held reservations about Ms. Freeman's election because he was a "Trump supporter." She understood this to mean that he had trouble working with a Black woman. He continued, expressing after meeting with her, that nonetheless he would be "OK with it."

Ms. Freeman, feeling extremely uncomfortable, explained what had occurred with Mr. Thomas to the then Town Supervisor, David Seeley, the Town's Director of Administration, Maria Vecchio, and to other Town Councilmembers. In particular, she asked that Mr. Thomas receive training because his comments could create liability for the Town should another person of color encounter him and hear how he felt.

Despite Plaintiff's report, upon information and belief, no action was taken to address Mr. Thomas's actions.

Approximately one week later, Ms. Freeman noticed a problem with her plaque ordered and installed by Mr. Thomas.
It is the practice of the Town that before a Member of Council takes office, the Town installs a plaque in the Town Hall featuring the elected official's name and title. Indeed, each of Ms. Freeman's colleagues, all of whom were white, had their names and titles on their plaques. But

Ms. Freeman's plaque only had her name. It had no mention of her being a Councilwoman. It had no title.

In addition,  Town Council members receive badges to identify themselves as elected officials. These badges, however, are rarely worn by Town officials. Ms. Freeman, the only Black Town Councilmember, was required, however, to wear her badge constantly. Without it, she was denied access to certain Town facilities, even though her picture was hanging in the Town Hall and even though she identified herself as a Councilmember. No other Councilmember (all of whom were white) was required to wear their badge in order to have access.

Even wearing the badge has not prevented discriminatory harassment. As recently as November 15, 2021, when Plaintiff entered City Hall after 5pm, she was challenged and followed by a white Town employee who followed her, demanded an explanation for her presence, and told her that the building was closed. Upon information and belief, he was motivated by the fact that she was Black and walking around a building which hosted few Black people.

From early on in her term, Ms. Freeman did not receive full packets of materials for her meetings, unlike white Councilmembers, nor did she receive her packets in a timely manner, unlike white Councilmembers. Further, during meetings her colleagues (all of whom are white) repeatedly shouted at and talked over Ms. Freeman and treated her less respectfully than they did other, white Councilmembers.

Ms. Freeman tried on several occasions to address these concerns. Unable to find any resolution, in March 2020, Ms. Freeman requested a formal meeting with her Town Board colleagues. Their response was to tell her to "get over it" and that "It happens to everyone."

On May 25, 2020, a Black Minneapolis, Minnesota resident named George Floyd was murdered in Minnesota by police officers—an event that caused protests across the United States (including in Irondequoit and Rochester) regarding policing, race discrimination, and race inequality.

On May 30, 2020, Ms. Freeman traveled to East Ridge Road in Irondequoit to survey damage done after a night of intense local protests. At the site she saw two police cars. Plaintiff approached one of the police cars, identified herself as a Town Councilwoman, and asked the two white officers inside for information about the damage.

The response of the officers was to ignore Plaintiff's requests for information. Plaintiff then asked both officers for their names. The officer on the driver's side answered, "Brandon. Why? You want to put it on Facebook?"

Shocked, Ms. Freeman went to another police car where she recognized the officer inside, Johnathan Lawton. Lawton was an officer that she had worked with for years on different initiatives. Officer Lawton shouted from his car to the other police vehicle asking the officer who refused to identify himself to state his name. Officer Lawton also identified Ms. Freeman as a Council Member. The police officer who refused to identify himself said nothing, continuing to refuse to fully identify himself to Plaintiff.

Plaintiff followed up by calling Town Supervisor Seeley and the Chief of Police, Alan Laird, informing them of her confrontation with the officer that refused to identify himself. Laird and Seeley informed Ms. Freeman that they would discipline the officer.

Later, after Ms. Freeman followed up; though Laird and Seeley told Plaintiff that they had disciplined the officer, they refused to tell her what specific actions that they had taken, and no apology was given by the officer to Plaintiff. Plaintiff asserted that she had a right to know,

as the officers answer to the Chief of Police and the Chief of Police answers to the Town

Council. Seeley and Laird, however, were unpersuaded by this, and to this day Ms. Freeman has

no idea what, if any, disciplinary action occurred.

In June 2020, Ms. Freeman was named Co-Chair of the Monroe County Alliance for the

Transformation of Community Policing. She started to schedule meetings at the Irondequoit

Public Library, a Town-owned facility.

Terry Thomas, head of maintenance, repeatedly refused to set up tables or prepare space

for the Alliance meetings, which, upon information and belief was not the practice with other

organizations using the library . Ms. Freeman explained her concerns directly to Mr. Thomas

and to the Town Council and was told again, "That's just Terry." Plaintiff explained that

Thomas's behavior, even if considered unintentional, was objectively discriminatory. Still, the

Town Council took no action.

In early August 2020, concerned by local protests and in response to the growing Black

Lives Matter movement, Town Supervisor Seeley contacted Ms. Freeman and told her that he

wanted to work on anti-racism measures, including forming a commission called I-CARE

(Irondequoit Commission Advancing Racial Equity). I-CARE's stated mission is to examine

Town policies, procedures, and practices to ensure that everyone in the Town is represented by

the local government, regardless of race, religion, or cultural identity.

Subsequently, the then Town Supervisor Seeley asked Ms. Freeman to be the Chair of

I-CARE and spearhead its initiatives.

Ms. Freeman accepted and dedicated her efforts to develop and build I-CARE by

recommending members to serve as Vice-Chairs and Community Shareholders and preparing a

budget, goals, and I-CARE policies and procedures.

Once the Town Council appointed I-CARE'S leadership, Ms. Freeman developed an Orientation Manual and conducted a two-day training for members of the commission. Plaintiff spoke to the Town's Director of Administration, Maria Vecchio, requesting duplication of the binders full of orientation materials. Ms. Vecchio denied her request and was told that there was no money available. Plaintiff reproduced the binders at her own expense.

Later, in February 2021, Ms. Freeman told Town Supervisor Seeley that her request for binders had been denied. Seeley expressed shock and dismay and immediately refunded Ms. Freeman the cost of the binders from the Supervisor's budget. Seeley then restated to Ms. Freeman his commitment to I-CARE, explaining to Ms. Freeman that he would provide her with an Administrative Assistant.

Further, Seeley approved of Freeman's initiative, through I-CARE, to create a first-time buyers program targeting minorities and underprivileged members of the Town. The planned buyers program was to be funded with resources recovered by the Town from the American Rescue Act, which amounted to millions of dollars.

Despite Seeley's support, in March 2021 Freeman tried to arrange for the town to pay for lunch for an I-CARE Orientation to the Town, but the Director of Administration told her that no money was available, which, upon information and belief, was untrue.

When the Irondequoit Rotary Club reached out to I-CARE about funding a project, Seeley suggested that Vecchio provide Freeman with a list of approved website contractors. However, when Freeman met with Vecchio about the website, Vecchio denied her request stating that I-CARE "did not need a website," and made it clear that she did not support the I-CARE Program.

During Spring 2021, with Seeley's backing, the Plaintiff prepared and the Town Council approved a Request for Proposal, seeking agencies interested in administering a new first-time home buyers' program, and the hiring of a part-time Administrative Assistant for I-CARE. Two organizations responded: The Urban League and The Housing Council at PathStone. The Town Council unanimously selected the Urban League.

In June 2021, Defendant Councilwoman Kimmie Romeo and Defendant Councilman John Perticone suddenly changed their position, announcing opposition to the selection of the Urban League because they said that if the Urban League administered the program, it would "solely be targeting Black people."

Further, Romeo and Perticone announced that they now opposed to the hiring of a part-time Administrative Assistant for I-CARE, and actively worked to prevent the filling of such a position.

Plaintiff met with Defendants Romeo and Perticone and explained that the Town Council had already approved the request for proposal and the selection of the Urban League as well as the Administrative Assistant position. In response, Defendant Romeo demanded an immediate accounting of all I-CARE activities and a comprehensive budget. Plaintiff responded that the budget had been approved by the Supervisor Seeley and contained within the budget of the Supervisor's office.

On August 1, 2021, Defendant John Perticone replaced Town Supervisor Seeley as Acting Supervisor, following Town Supervisor Seeley's sudden decision to step down. Besides Ms. Freeman, Town Supervisor Seeley had been I-CARE's biggest supporter. Without the Supervisor's support, the racially motivated attacks on I-CARE and Ms. Freeman herself intensified.

At a public meeting on August 10, 2021, Defendant Kimmie Romeo asked to read something into the record. In Romeo's statement she declared that she wanted the Town Clerk to document that she met with residents who wanted information regarding I-CARE's activities. She stated that residents were unhappy that they could not publicly access information on I-CARE's budget and activities, and that residents had made legal requests for information that were denied. Ms. Freeman asked the Town Clerk if such requests were made, and no records of such requests could be found.

Plaintiff subsequently approached Defendant Romeo in private to see if she could resolve the matter. She expressed to Ms. Romeo that there was no need to imply secrecy or wrongdoing because Ms. Freeman had submitted the budget to the Supervisor's office, and that no request for information had been ignored.

The conversation became mutually argumentative. Subsequently, Defendant Romeo falsely accused Ms. Freeman—a longtime minister and peace advocate—stating that Plaintiff has "Threatened her life." Defendant Romeo followed up by calling the police and filing a false complaint, making the same false allegation six days later.

Feeling exhausted and confused, Ms. Freeman went to the Defendant Acting Supervisor, Perticone, to express her dismay, especially given the Town Council's previous support. Defendant Perticone blamed Ms. Freeman for her predicament and accused her of having an "agenda" which was not in the interests of the Town. She understood this to mean that having more Black homeowners in the Town was "not in the interests of the Town."

Perticone stated that he was going to assert control over I-CARE, to which Ms. Freeman explained that a Town Commission—once formed and given authority to proceed—cannot be run by anyone other than the Commission members.

Following her meeting with Perticone, Ms. Freeman prepared a preliminary I-CARE budget for 2022 and submitted it to the Town Board. Subsequent budget meetings became hostile, however, with I-CARE becoming a subject of a heated debate. A budget was never approved.

On several occasions between October and November 2021, off-duty armed members of the Irondequoit Police Department came unannounced to public meetings on the I-CARE budget. They sat in the front row, firearms openly visible, glaring at Plaintiff throughout the meeting. Ms. Freeman expressed to her fellow Councilmembers and Police Chief Alan Liard that these actions were intimidating.

Freeman was told by Defendant Romeo (who was the Town Council liaison to the police) that it was a "free country" and that the police had just as much of a right to be there as anyone. On October 27, 2021, Acting Supervisor Perticone was recorded chasing, screaming, blocking the way of, and harassing Ms. Freeman because she was recording the presence of police officers at a budget meeting concerning, in part, the proposed I-CARE budget. This incident was highlighted by local media.

In November 2021, Rory Fitzpatrick was elected Town Supervisor of Irondequoit. In late 2021 the status of I-CARE was in doubt, with the newly elected Supervisor, Rory Fitzpatrick, attempting to unilaterally assert control over the Commission by sending communications to I-CARE members without consultation with the Chair or Vice-Chairs, denying Ms. Freeman access to relevant information and undermining her role as Chair, labeling I-CARE as a private organization, barring I-CARE from Town facilities, and refusing to honor I-CARE's contract with the Urban League.

At present, Ms. Freeman herself continued to feel unwelcomed in the Town Hall because she is Black. She continues to be scolded and screamed at in Council meetings by her colleagues and by Town employees. She is often not included in official communications, unlike the Council's white members, and is prevented from participating in official business.

Ms. Freeman has complained on several occasions to the Human Resources Department of the Town of Irondequoit about the race-based discrimination that she has experienced, but no change has occurred. Instead, the HR personal described what was occurring as a "personal dispute."

The treatment of Plaintiff Freeman has occurred because of her race, and because her work involves associating with and giving aid to people who are non-white.

## STANDARD OF REVIEW

"A complaint will survive a motion to dismiss so long as it 'contain[s] sufficient factual matter ... to state a claim to relief that is plausible on its face.'" Mandala v. NTT Data, Inc., 975 F.3d 202, 207 (2d Cir. 2020), quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009). "In making that assessment, we accept the plaintiff's factual allegations as true and draw all reasonable inferences in her favor." Id., quoting Menaker v. Hofstra Univ., 935 F.3d 20, 30 (2d Cir. 2019).

## ARGUMENT

## POINT I

## THE COMPLAINT SUFFICIENTLY PLEADS A
## FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIM.

Under Section 1983, a Plaintiff may bring a claim alleging violation of the Equal Protection Clause of the 14th Amendment under a variety of different theories. See Brown v, Oneonta, 221 F.3d 329, 337 (2d Cir. 2000) (there are "several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Claese"). Defendants' contention that an equal

protection claim must plead facts showing differential treatment of similarly situated individuals only applies to one species of equal protection claim. A plaintiff may allege "an express racial classification, or allege[] that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus." Pyke v. Cuomo, 259 F.3d 107, 111 (2d Cir. 2001). "It is unnecessary for the plaintiffs to allege or show either an express racial classification embedded in a statute or policy, or the existence of better treated, similarly situated persons of a different race." Id. Nevertheless, Plaintiff has amended her Complaint so as to allege that her treatment as a Councilmember is unlike that of any other Councilmember, all of whom are white.

The Complaint pleads that "Defendants Perticone and Romeo, by acting as aforedescribed, have sought to deny Plaintiff, and those whose interests she is promoting—Black potential homeowners—of equal protection of the law." Complaint ¶ 63. The Complaint specifically pleads, among other things that:

- "[T]he Town prepared and approved a request for proposal for agencies interested in administering a new first-time home buyers' program and the hiring of a part-time Administrative Assistant." Complaint ¶ 40.

- "The Town Council unanimously selected the Urban League." Complaint ¶ 41.

- "In June 2021, Defendant Councilwoman Kimmie Romeo and Defendant Councilman John Perticone suddenly changed their position, announcing opposition to the selection of the Urban League because they said that if the Urban League administered the program, it would "solely be targeting Black people.'" Complaint ¶ 42.

- "Romeo and Perticone were suddenly opposed to the hiring of a part- time Administrative Assistant for I-CARE, and actively worked to prevent the creation of such a position. Complaint ¶ 43.

- "At a public meeting on August 10, 2021, Defendant Kimmie Romeo asked to read something into the record. In Romeo's statement she declared that she wanted the Town Clerk to document that she met with residents who wanted information regarding I-CARE's activities. She stated that residents were unhappy that they could not publicly access information on I-CARE's budget and activities, and that residents had made legal requests for information that were denied. Ms. Freeman asked the Town Clerk if such requests were made, and no records of such requests could be found." Complaint ¶ 47.

- "Perticone stated that he was going to assert control over I-CARE, to which Ms. Freeman explained that a Town Commission—once formed and given authority to proceed—cannot be run by anyone other than the Commission members. Complaint ¶ 51.

Taken together these facts allege a number of actions on the part of the defendants Romeo and Perticone to frustrate a program approved by the Town Board that was designed to promote first time home ownership by Blacks and other minorities for no other reason than stated opposition to the program on the grounds that it benefitted "Black people." See supra. These are all specific, factual allegations that state an equal protection claim, as do the series of petty slights faced by Plaintiff, as the only Black Council Member, which hark back to the days of "Whites Only" public facilities.

## POINT II

## THE COMPLAINT SUFFICIENTLY PLEADS A
## MONELL CLAIM AGAINST THE MUNICIPAL DEFENDANT

To hold a municipality liable as a "person" within the meaning of §1983, a plaintiff must establish that there was a policy or practice by the municipality. Oklahoma City v. Tuttle, 471 U.S. 808 (1985), reh'g denied, 473 U.S. 925 (1985); Monell, 436 U.S. at 690-91. Moreover, a plaintiff must show "a municipal policy or custom … that caused his injuries … [and] a causal connection … 'between the policy and deprivation of his constitutional rights.'" Vippolis v. Village of Haverstraw, 768 F.2d 40, 44 (2d Cir. 1985) (citing Tuttle, 471 U.S. at 824, n.8).

In the case at bar, the Complaint specifically alleges, "Because Defendant Perticone took his actions as Town Supervisor, and because his actions and those of Defendant Romeo and the police officers seeking to intimidate Plaintiff were not addressed by the Town of Irondequoit, and were, in fact, condoned by the Town of Irondequoit, the Town of Irondequoit is liable to Plaintiff for the injury cause for violation of her rights to equal protection under the Fourteenth Amendment. Complaint ¶ 65. See also Complaint ¶¶ 66 ("Because it condoned Perticone and Romeo's actions, and the actions of the other Town employees who discriminated against Plaintiff, and her efforts to develop the work of I-Care, it is  liable under 42 U.S.C. Section 1983.") The Complaint specifically alleges explicit enactments taken by the Town of Irondecquot under the direction of than Acting Supervisor Perticone (and continued by current Supervisor Fitzpatrick), that were designed to frustrate and impede the Town Approved, I-Care program and undercut its contract with the Urban League. Id. Those actions were taken by the Town to further explicitly discriminatory designs. See supra. The pleading is on all fours with the requirements of Monell.

## POINT III

## THE COMPLAINT SUFFICIENTLY PLEADS A SECTION 1981 CLAIM

Defendants essentially argue that Plaintiff has not pleaded facts sufficient to establish that she was denied any of the rights protected by Section 1981 on account of her race. It is black letter law in this Circuit that Section 1981 protects against the actions of third parties as well as actions of immediately contracting parties. See, e.g., Ginx, Inc. v. Soho Aliiance, 720 F.Supp.2d 342, 358 (2d Cir. 2010). Section 1981 also protects the right of protected class members to enjoy the benefits of real estate purchases and home ownership. See, e.g., Newbern v. Lake Lorelie, Inc., 308 F.Supp, 407 (S.D. Ohio 1968).

The Complaint pleads that the Defendants repeatedly attempted to interfere with Plaintiff's efforts under the auspices of I-Care to contract with the Urban League, and ultimately attempted to interfere with the promotion of home ownership for minorities and the poor.

The Complaint pleads that this interference with both the contract Plaintiff wanted to make through I-Care with the Urban League, to effectuate the contract with the Urban League, and ultimately the right of minorities to own homes with help from the Urban League and I-Care, was carried out because of racial animus.

Defendants' arguments about the insufficiency of the pleadings with respect to the Town's liability under Section 1981 are inapposite. First, these claims are asserted against the individual defendants. Second, Monell's limitation on municipal liability only applies to Section 1983 claims. Third, the District Court case cited by the Defendants for the proposition that Monell's requirements apply to Section 1981 holds no such thing. See Gertskis v. EEOC, 2013 WL 1148925 at *10 (dismissing Plaintiff's Section 1981 claims pursuant to the preclisoce effect of an administrative termination, not because Monell Liability had been insufficiently pleaded or

demonstrated, "when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the state's courts") (internal citation omitted).

## POINT IV

### DEFENDANTS' ACTIONS ARE NOT PROTECTED BY LEGISLATIVE OR QUALIFIED IMMUNITY

"Under the Supreme Court's functional test [for determining the applicability] of absolute legislative immunity, whether immunity attaches turns not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question." Olma v. Collins, 499 Fed. Appx. 98, 100 (2d Cir. 2012), quoting Almonte v. City of Long Beach, 278 F.3d 100, 106 (2007). Actions that "are integral steps in the legislative process" are protected. Id.

None of the discriminatory actions taken on the part of the Defendants to frustrate minority home ownership or to hamper Plaintiff's efforts to promote minority home ownership touch upon actions that were "integral steps to the legislative process." See Point I supra. Rather, the actions were taken by the Defendants *after* a legislative body had approved bringing on the Urban League. and putting the Urban League contract in plan. Those actions did not involve using the legislative process to reverse the Town Board's prior approval of the program in questions, but the abuse of Defendants' positions to frustrate a legitimate legislative enactment for racially motivated reasons.

None of the actions taken by the Defendants are covered by qualified immunity as all of their actions were carried out to explicitly frustrate minority home ownership. Their actions were taken knowing that those actions would violate the constitutional rights of Plaintiff. See Harlow v. Fitzgerald, 457 US 800, 815 (1982).

## POINT V

### DEFENDANTS' ARGUMENT ON THE SUFFICIENCY
### OF THE NOTICE OF CLAIM IS INAPPOSITE

Defendant's arguments on the necessity of a notice of claim under the New York Municipal Law are inapposite as the Fourth Cause of Action (defamation) is clearly pleaded against Defendant Romeo's actions as an individual, and not against any actions she took in an official capacity.

## POINT VI

### PLAINTIFF HAS ADDRESSED THE "NECESSARY PARTY" ISSUE
### BY SUING INDIVIDUALLY AND AS CHAIR OF I-CARE

In the Amended Complaint, Plaintiff makes it clear that she brings suit both on her own behalf and on behalf of I-CARE, as its Chair. I-CARE's ability to fulfill its contract with the Urban League has been interfered with by Defendants Perticone and Romeo, and now by the Town, and representation by its Chair, since it is an unincorporated association is appropriate.

## POINT VII

### DISMISSAL ON "FAILURE TO PROPERLY
### SERVE" GROUNDS IS INAPPROPRIATE

Defendants assert—via counsel's declaration—that they were served with unsigned copies of the Summons. But in the record, on the docket as items 3, 4, and 5, are sworn affidavits from the process server that he served the "summons" to the Town and to the homes of each of the individual defendants. His affidavit regarding Defendant Perticone wholly differs from counsel's recitation.

The Second Circuit, in Old Republic Insurance Co. v. Pacific Financial Services, 301 F.3d 54, 58-59 (2002), states that in New York, "a process server's affidavit of service establishes a prima facie case of the account of service, and [that] this, in the absence of contrary facts, we

presume that [defendant] was properly served … No hearing is required where the defendant fails to swear to 'specific facts to rebut the statements in the process server's affidavits.' A statement from a non-party, like counsel, does not create the need for a traverse hearing."

## **CONCLUSION**

For the foregoing reasons Defendants' Motion to Dismiss should not be granted.

Dated: New York, New York
July 22, 2022

ADVOCATES         FOR         JUSTICE
CHARTERED ATTORNEYS
*Attorneys for Plaintiff*

By:_____/s/ *Arthur Z. Schwartz*_____
                Arthur Z. Schwartz
225 Broadway, Suite 1902
New York, New York 10007
Tel.: 212-285-1400
Fax: 212-285-1410
aschwartz@advocatesny.com